1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANDREW RICK LOPEZ,                        No.  2:98-cv-2111-MCE-EFB P

12              Plaintiff,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   D. PETERSON, et al.,

15              Defendants.

16

17        Plaintiff is a state prisoner who, represented by counsel, brings this action pursuant to 42

18   U.S.C. § 1983.  Now pending before the court are cross motions for summary judgment.  ECF

19   Nos. 458 & 466.  The parties have offered responses to their opponent's motions (ECF Nos. 467

20   & 473) and replies in support of their own (ECF Nos. 472 & 474).  The court also held a hearing

21   on the motion on September 14, 2016 with counsel for both parties in attendance.  ECF No. 475.

22   Finally, plaintiff has also filed a motion for substitution of deceased defendant (ECF No. 465)

23   which seeks to substitute defendant D. Peterson for defendant C.J. Peterson.  For the reasons

24   stated hereafter, plaintiff's motion for summary judgment should be denied, defendants' motion

25   for summary judgment should be granted in part, and the motion to substitute defendant denied as

26   moot.

27   /////

28   /////

                                              1

**I.      Procedural Background**

Plaintiff filed the initial complaint in this action on October 28, 1998.  ECF No. 1.  His initial complaint was dismissed on May 11, 2001 for failure to comply with the court's order requiring him to submit a second amended complaint.  ECF Nos. 96, 98.  Plaintiff appealed that decision (ECF No. 102) and the U.S. Court of Appeals for the Ninth Circuit reversed and remanded to allow the court to rule on plaintiff's request for relief under Federal Rule of Civil Procedure 4(A)(5) (ECF No. 113).  This court reinstated plaintiff's original amended complaint (ECF No. 10-1) which had previously been dismissed.  ECF No. 114.  In June of 2005, the court dismissed all but one defendant.  ECF No. 227.  Plaintiff appealed again (ECF No. 233) and in May of 2009 the Ninth Circuit partially reversed the district court's decision (ECF No. 304).  Plaintiff filed a second amended complaint on October 7, 2009 (ECF No. 319) and, in April of 2011, defendants filed a motion to dismiss (ECF No. 333).  That motion was granted in part and this action now rests solely on the following claims: (1) defendants Castro and D. Peterson violated plaintiff's Eighth Amendment rights by keeping him in lockdown from May 7, 1999 until December 8, 1999; (2) defendant Wright retaliated against plaintiff in violation of the First Amendment by depriving him of his legal materials on August 12, 1997 and issuing a false rules violation report against him on August 21, 1997; (3) defendants Holmes, C.J. Peterson, and D. Peterson violated plaintiff's due process rights with respect to rules violation report 98-06-009; (4) defendants Babich, Baughman, and Diggs' decision not to recalculate plaintiff's classification score on January 5, 1999 violated plaintiff's rights under the First and Fourteenth Amendments; (5) Defendants Reyes' calculation of plaintiff's classification score violated his rights under the First and Fourteenth Amendments; and (6) that defendant Haas violated plaintiff's First Amendment rights by falsely accusing him of being a 'shot caller' on February 26, 1999.  ECF Nos. 363 & 367.

**II.     Allegations in Plaintiff's Complaint**

**A.       <u>Eighth Amendment claims against defendants Castro and D. Peterson</u>**

Defendant Castro, in his capacity as warden of the High Desert State Prison ("HDSP"), allegedly violated plaintiff's Eighth Amendment rights by causing him to remain in lockdown

from May 7, 1999 to December 8, 1999.[1]  ECF No. 319 ¶ 67.  Plaintiff claims that this lockdown was atypical and significant insofar as it denied him outdoor exercise, meaningful access to a law library,[2] telephone access, quarterly packages, and other privileges.  *Id.* ¶ 70.  He alleges that defendant D. Peterson also bore responsibility for maintaining his lockdown during this period.  *Id.*

**B.**  **First Amendment retaliation claim against defendant Wright**

Plaintiff alleges that, on August 12, 1997, he took his legal materials to the recreation yard at HDSP.  *Id.* ¶ 43.  A prison riot broke out on the yard and staff used tear gas, 'block gun projectiles', and live ammunition to quell it.  *Id.*  After the riot was subdued, defendant Wright approached plaintiff and directed him to proceed to the unit gym.  *Id.*  Plaintiff alleges that he moved to comply and tried to take his legal materials with him, but Wright directed him to leave the materials on the yard.  *Id.*  Plaintiff later returned to the yard and found that his bag was missing and its contents had been spilled into a general pile which contained the property of many other inmates.  *Id.*  Some of his legal materials were allegedly lost in this process.  *Id.*  Plaintiff told defendant Wright that he would be held responsible for the loss of his legal materials and Wright allegedly responded by saying "[d]o what you do best, I got a surprise for you too."  *Id.*  He claims that Wright orchestrated the loss of these legal materials as retaliation for plaintiff's activities as a "jailhouse lawyer."  *Id.*

Later, on August 21, 1997, Wright allegedly undertook a second allegedly retaliatory act – this time based on plaintiff's expressed intent to file a grievance against him - when he issued plaintiff a rules violation report falsely charging him with involvement in the August 12 riot.  *Id.* ¶¶ 43, 58.  Plaintiff alleges that this disciplinary action was dismissed and then re-issued by

---

[1] Plaintiff actually alleges that his lockdown confinement began in August of 1997.  ECF No. 319 ¶¶ 67-70.  Claims relating to his lockdown before May 7, 1999 were dismissed as unexhausted, however.  ECF No. 363 at 17-18.  Plaintiff alleges that he was no longer subject to the lockdown after December 8, 1999 when he "departed the HDSP-C facility."  ECF No. 319 ¶ 70.

[2] The court allowed only plaintiff's Eighth Amendment claims to proceed, however.  ECF No. 363 at 31.  As such any claims related to law library access will not be considered.

3

1   Wright; i.e., a third retaliatory action. *Id.* ¶ 43.  This final claim regarding the reissuance of the

2   disciplinary was dismissed as unexhausted, however.  ECF No. 363 at 22.

3          **C.**       <u>**Fourteenth Amendment Due Process claims against defendants Holmes, C.J.**</u>

4               <u>**Peterson, and D. Peterson**</u>

5       Plaintiff claims that, on June 5, 1998, defendant Holmes wrongfully issued him a rules

6   violation report for failing to remove his clothes so he could be photographed.  ECF No. 319

7   ¶¶ 59, 74.  He argues that he was never given notice of the rule Holmes relied upon to assess the

8   disciplinary.  *Id.* ¶ 74.  Next, he claims that defendant C.J. Peterson unlawfully reduced the

9   charge from a serious rules violation to an administrative charge prior to the scheduled hearing on

10   the issue in order to prevent a staff assistant from helping plaintiff and to keep his evidence from

11   being made part of the permanent record.  *Id.* ¶¶ 71, 93.  Finally, he claims that defendant D.

12   Peterson – C.J. Peterson's spouse and superior officer – ordered C.J. Peterson to find plaintiff

13   guilty of this administrative charge.  *Id.* ¶¶ 70-71.

14          **D.**       <u>**First and Fourteenth Amendment claims against defendants Babich,**</u>

15               <u>**Baughman, and Diggs**</u>

16       Plaintiff claims that, on January 5, 1999, defendants Diggs, Baughman, and Babich

17   ignored his notice that Cal. Code Regs. tit. 15, § 3375 required them to reduce his inmate

18   classification score.  *Id.* ¶ 66.  He argues that their refusal to reduce his classification score was

19   "arbitrary and capricious, and lacked penological justification."  *Id.* ¶¶ 76-78.  Plaintiff also

20   contends that the decision not to recalculate his score was retaliatory insofar as defendants Babich

21   and Diggs mentioned his ongoing suit against a prison employee in a 'negative tone.' Id. ¶¶ 51-

22   52; ECF No. 458-1 ¶ 119.[3]

23   /////

24   /////

---

25        [3] Plaintiff's allegations regarding the negative tone do not actually appear in his complaint

26   (ECF No. 319).  That document simply alleges that the decision not to reclassify him was
retaliation for his litigative activities.  The 'negative tone' allegation surfaces in his statements of

27   undisputed facts.  ECF No. 458-1 ¶ 119.  Defendants dispute that Babich or Diggs made any
comments to that effect.  ECF No. 467-2 at 27.

28

### E.  First and Fourteenth Amendment claims against defendant Reyes

Plaintiff alleges that, on January 28, 1999, Reyes retaliated against him by raising his inmate classification score by twelve points.  *Id.* ¶¶ 64, 73.  He argues that Reyes' retaliation was motivated by his filing of a grievance on January 5, 1999.  *Id.* ¶ 66.  He argues that her actions violated due process insofar as they contravened the requirements encapsulated in Cal. Code Reg. tit. 15, § 3375.  *Id.* ¶ 64.

### F.  First Amendment claim against defendant Haas

Plaintiff claims that, on February 26, 1999, defendant Haas approached his cell and loudly announced that plaintiff was a 'shot caller' three times.  *Id.* ¶ 47.  He argues that Haas' statements were intended to single out him out for serious injury or death at the hands of other inmates.  *Id.* Haas' actions were allegedly retaliation for plaintiff's litigative activities and stated intention to file grievances.  *Id.*

## III.  Legal Standards

### A.  Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994).  At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)  (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  Procedurally, under summary

1  judgment practice, the moving party bears the initial responsibility of presenting the basis for its

2  motion and identifying those portions of the record, together with affidavits, if any, that it

3  believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323;

4  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets

5  its burden with a properly supported motion, the burden then shifts to the opposing party to

6  present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*,

7  477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

8      A clear focus on where the burden of proof lies as to the factual issue in question is crucial

9  to summary judgment procedures. Depending on which party bears that burden, the party seeking

10  summary judgment does not necessarily need to submit any evidence of its own. When the

11  opposing party would have the burden of proof on a dispositive issue at trial, the moving party

12  need not produce evidence which negates the opponent's claim. *See, e.g., Lujan v. National*

13  *Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters

14  which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-

15  24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a

16  summary judgment motion may properly be made in reliance solely on the 'pleadings,

17  depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment

18  should be entered, after adequate time for discovery and upon motion, against a party who fails to

19  make a showing sufficient to establish the existence of an element essential to that party's case,

20  and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a

21  circumstance, summary judgment must be granted, "so long as whatever is before the district

22  court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

23  satisfied." *Id.* at 323.

24      To defeat summary judgment the opposing party must establish a genuine dispute as to a

25  material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that

26  is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at

27  248 ("Only disputes over facts that might affect the outcome of the suit under the governing law

28  will properly preclude the entry of summary judgment."). Whether a factual dispute is material is

1    determined by the substantive law applicable for the claim in question.  *Id.*  If the opposing party

2    is unable to produce evidence sufficient to establish a required element of its claim that party fails

3    in opposing summary judgment.  "[A] complete failure of proof concerning an essential element

4    of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S.

5    at 322.

6         Second, the dispute must be genuine.  In determining whether a factual dispute is genuine

7    the court must again focus on which party bears the burden of proof on the factual issue in

8    question.  Where the party opposing summary judgment would bear the burden of proof at trial on

9    the factual issue in dispute, that party must produce evidence sufficient to support its factual

10   claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.

11   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit

12   or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue

13   for trial.  *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076.  More significantly, to

14   demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such

15   that a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*,

16   477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

17        The court does not determine witness credibility.  It believes the opposing party's

18   evidence, and draws inferences most favorably for the opposing party.  *See id.* at 249, 255;

19   *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the

20   proponent must adduce evidence of a factual predicate from which to draw inferences.  *American*

21   *Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J.,

22   dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at

23   issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th

24   Cir. 1995).  On the other hand, the opposing party "must do more than simply show that there is

25   some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

26   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

27   trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant

28   summary judgment.

**B.      Eighth Amendment Standard for Denial of Exercise**

The Eighth Amendment prohibits cruel and unusual punishment by state actors.  *Estelle v. Gamble*, 429 U.S. 97, 101-102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  Outdoor exercise is recognized as a basic human need under the Eighth Amendment and its denial may violate an inmate's rights under certain circumstances.  *See Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. Cal. 2010).  Accordingly, inmates may challenge conditions of confinement that are exceptionally cruel.  "Where the conditions of confinement are challenged rather than the confinement itself, a plaintiff must make two showings. First, the plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious' to form the basis for an Eighth Amendment violation. Second, the plaintiff must make a 'subjective' showing that the prison official acted 'with a sufficiently culpable state of mind.'"  *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (internal citations omitted).

**C.      First Amendment Standard for Retaliation**

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (fn. and citations omitted).  "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm."  *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).  Among a prisoner's First Amendment rights are "the right to file prison grievances and the right to pursue civil rights litigation in the federal courts."  *Silva v. Di Vittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011).

A successful retaliation claim need not allege that the retaliatory action itself violated some constitutional right.  *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  An inmate must, however, demonstrate that his protected conduct was a substantial or motivating factor in the defendant's adverse action against him.  *Soranno's Gasco v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).  To that end, an inmate must allege sufficient facts which clearly indicate that the

1    adverse actions were retaliatory, mere speculation on this point is insufficient. *Wood v. Yordy*,

2    753 F.3d 899, 905 (9th Cir. 2014).  Finally, an inmate may not establish retaliation merely by

3    alleging that an adverse action befell him after he engaged in some protected activity; he must

4    establish some nexus between the two. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir.

5    2000) (retaliation claim cannot rest on the logical fallacy of post hoc, ergo propter hoc, i.e., "after

6    this, therefore because of this").

7         **D.**      **Fourteenth Amendment Standard for Due Process**

8        The Fourteenth Amendment protects individuals from being deprived of life, liberty, or

9    property without due process of law.  U.S. Const. amend. XIV, § 1.  That being said, "[t]he

10    requirements of procedural due process apply only to the deprivation of interests encompassed by

11    the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S.

12    564, 569 (1972).  A prisoner's protected liberty interests are "generally limited to freedom from

13    restraint which . . . imposes atypical and significant hardship on the inmate in relation to the

14    ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L.

15    Ed. 2d 418 (1995); *Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007).  To state a procedural

16    due process claim, a plaintiff must allege: "(1) a liberty or property interest protected by the

17    Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process."

18    *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000).

19   **IV.**    **Analysis**

20        After review of the pleadings and, for the reasons stated below, the court finds that

21    plaintiff's motion for summary judgment (ECF No. 458) must be denied in its entirety and

22    defendants' motion for summary judgment (ECF No. 466) must be granted in part.  The following

23    claims should be dismissed: (1) the Eighth Amendment claims against defendants Castro and D.

24    Peterson; (2) due process claims against Holmes, C.J. Peterson, and D. Peterson; (3) the

25    Fourteenth Amendment claims against defendants Babich, Baughman, Diggs; (4) the First

26    Amendment claim against defendant Baughman; and (5) the First and Fourteenth Amendment

27    claims against defendant Reyes.  The First Amendment retaliation claims against Babich, Diggs,

28    Wright, and Haas should proceed.

**A.** **Eighth Amendment claims against defendants Castro and D. Peterson**

As noted above, plaintiff alleges that prison lockdowns instituted by defendants Castro and D. Peterson denied him outdoor exercise between May 7, 1999 until December 8, 1999. Defendants argue that these lockdowns were penologically justified and that Castro and D. Peterson are entitled to qualified immunity on this basis.  ECF No. 467 at 25.  The court agrees.

A court undertakes a two-part analysis to determine whether a defendant is entitled to qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  The first prong of the test asks whether the facts "[t]aken in the light most favorable to the party asserting the injury" shows that the defendant violated a constitutional right.  *Id*.  The second prong asks whether "the [violated] right was clearly established" at the time of the alleged violation.  *Id*.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202.  Both prongs are pure questions of law.  *See Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003).

Turning to the facts underlying the lockdowns, Warden Castro's sworn affidavit states that racial violence at HDSP during the relevant time period had reached dangerous levels.  He states that, as of May 7, 1999, the Northern Hispanics – to which Lopez purportedly belonged – had been on a modified program because of a March 29, 1999 attack on a Southern Hispanic and a March 31, 1999 assault on a white inmate.  ECF No. 467-5 ¶ 20.  Throughout May and June racial violence between inmates resulted in the lockdown of facilities A, B, C, and D at HDSP. *Id*. ¶ 21.  Plaintiff was housed in facility C during this time period and, on June 14, 1999 a riot involving Southern Hispanic, Mexican-National, and White inmates erupted there.  *Id*. ¶¶ 18, 24. The State of Emergency was lifted on August 5, 1999 and plaintiff was on a normal program until October 4, 1999.  *Id*. ¶ 25.  A lockdown was reinstituted at Facility C on that date and lasted until October 11, 1999, but Warden Castro concedes the reports for this period are now unavailable and he no longer knows the reason for this change in program.  *Id*. ¶ 27.  Regardless, defendants argue that this week long lockdown was not a constitutional violation.  ECF No. 467 at 20.  A lockdown was re-imposed at Facility C on October 20, 1999 after four Northern Hispanics

10

attacked two Other[4] inmates.  *Id.* ¶ 29.  This lockdown lasted until the events of November 22, 1999, described *infra*, necessitated the declaration of a State of Emergency and a prison-wide lockdown.  *Id.*

On November 22, 1999 twenty-five Black inmates attacked prison staff who were attempting to search them for weapons.  *Id.* ¶ 31.  A prolonged altercation between Black inmates and prison staff resulted in eleven members of the prison staff being hospitalized.  *Id.*  Later that day, twenty-one Southern Hispanic and Mexican inmates refused staff directions to exit a building, attempted to assault staff, and were ultimately repelled with tear gas.  *Id.* ¶ 32.  As noted above, these incidents prompted Warden Castro to institute a prison-wide lockdown.  *Id.*

Violence against prison staff persisted through the end of November and Warden Castro states that he felt compelled to maintain the prison-wide lockdown until January 6, 2000.  *Id.* ¶ 34.  During this period, prison staff searched much of the prison for weapons and conducted inmate interviews to ascertain the cause of the elevated violence levels.  *Id.* ¶ 35.

Defendants acknowledge that two lockdown periods without outdoor exercise (May 7 to August 17 of 1999 and October 21 to December 8 of 1999) amounted to substantial deprivations.  ECF No. 467 at 20.  Defendants contend, however, that the seven day denial of recreation from October 4 to 12, 1999 did not amount to a substantial deprivation.  On this record, the court agrees.  A week long denial of outdoor exercise which results in no adverse medical effects is not a substantial deprivation.  *See May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (holding that a 21 day deprivation of outdoor activities was, absent medical effects, not a serious deprivation); *Norwood v. Vance*, 591 F.3d 1062, 1070 (9th Cir. 2010) ("Although exercise is one of the basic human necessities protected by the Eighth Amendment, a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation.") (internal quotations and citations omitted).

/////

---

[4] Warden Castro defines the 'Other' inmate category as comprising those non-Hispanic, non-Black, non-Mexican, and non-White inmates.  ECF No. 467-5 ¶ 25.

With respect to the longer lockdowns, the court finds that the penological justifications offered by defendants for these restrictions are persuasive, and even more so when placed in the context of a qualified immunity argument.  As a threshold matter, a prisoner's right to outdoor exercise is not "absolute and indefeasible" in the face of prison violence.  *Id.* at 1068-1069. "When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control."  *Id*. at 1069. Further:

> [W]hen balancing the obligation to provide for inmate and staff safety against the duty to accord inmates the rights and privileges to which they are entitled, prison officials are afforded wide-ranging deference.  When a lockdown was in response to a genuine emergency, and restrictions were eased as the prison administration determined the emergency permitted, we may not lightly second-guess officials' expert judgments about when exercise and other programs could safely be restored. These decisions are delicate ones, and those charged with them must be given reasonable leeway.

*Id*. at 1069-1070. (Internal quotations and citations omitted).  In *Noble v. Adams*, a case decided in 2011, the Ninth Circuit held that:

> [I]t was not clearly established in 2002 — nor is it established yet — precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot, here one in which inmates attempted to murder staff.

636 F.3d 525, 529 (9th Cir. 2011).

Based on the foregoing, the court concludes that defendants Castro and D. Peterson[5] are entitled to qualified immunity on plaintiff's Eighth Amendment lockdown claims.

/////

---

[5] Although plaintiff alleges that D. Peterson placed him on lockdown as retaliation for his lawsuits, the retaliatory actions he attributes to her all relate to 1998.  ECF No. 458 at 14.  His lockdown claims are limited by exhaustion, however, to the time period ranging from May 7, 1999 to December 8, 1999.  In any event, the court previously specified that these claims would proceed only in an Eighth Amendment context.  ECF Nos. 363 & 367.

**B.     First Amendment claim against defendant Wright**

As noted above, plaintiff's retaliation claims against defendant Wright are based on: (1) the loss of plaintiff's legal materials due to Wright's instruction that those materials be left behind on the recreation yard after an August 12, 1997 riot; and (2) Wright's assessment of an allegedly false disciplinary against plaintiff for involvement in that same riot.  The facts surrounding these claims are disputed and, as such, the court concludes that neither party is entitled to summary judgment on these claims.

First, plaintiff's arguments that Wright's actions *can only be* interpreted as retaliation for plaintiff's activities as a 'jailhouse lawyer' are unpersuasive.  The parties do not dispute that a violent riot occurred on that date and, consequently, the court finds that a reasonable fact-finder could conclude that the rationales offered by Wright for his actions – that (1) all inmate belongings had to be left behind to prevent the traffic of contraband to secure areas and (2) that he earnestly believed that plaintiff had been involved in the riot – were genuine.  A reasonable fact-finder could also, however, credit plaintiff's claims that: (1) Wright had frequently and derogatorily made reference to his litigative activities; (2) he explicitly told Wright that the bag contained sensitive legal materials; (3) the contents of his bag were not merely withheld, but instead dumped into a mass pile with other inmates' belongings thereby ensuring that some would be lost; and (4) Wright responded to plaintiff's complaints about the loss of his legal materials by alluding to a forthcoming 'surprise', which would eventually materialize as the relevant disciplinary.[6]

In short, resolving these disputed facts would require the court to make a credibility determination and summary judgment is inappropriate on that basis.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

---

[6] Defendants dispute that Wright made reference to any 'surprise'.  ECF No. 467-2 at 12; *see also* ECF No. 467-11 (Wright's declaration).

13

1    **C.      Due Process claims against defendants Holmes, C. J. Peterson, and D.**

2            **Peterson**

3            As noted above, Plaintiff claims that, on June 5, 1998, defendant Holmes wrongfully

4    issued him a rules violation report for failing to remove his clothes so he could be photographed.

5    Plaintiff alleges that Holmes did not give him notice of the rule he violated, and defendants C.J.

6    Peterson and D. Peterson conspired to ensure that he was convicted of the rules violation.  For the

7    reasons stated hereafter, this claim should be dismissed.

8            "[P]rison disciplinary proceedings are not part of a criminal prosecution and the full

9    panoply of rights due a defendant in such proceedings does not apply."  *Ponte v. Real*, 471 U.S.

10   491, 495 (1985).  With respect to a prison disciplinary violation, due process demands: (1) a

11   written statement at least twenty-four hours before the disciplinary hearing that includes the

12   charges, a description of the evidence against the prisoner, and an explanation for the disciplinary

13   action taken; (2) an opportunity to present documentary evidence and call witnesses, unless

14   calling witnesses would interfere with institutional security; and (3) legal assistance where the

15   charges are complex or the inmate is illiterate.  *See Wolff v. McDonnell*, 418 U.S. 539, 563-70

16   (1974).

17           The record indicates that plaintiff was provided with written notice of the charges against

18   him - in this case violating California Code of Regulations, Title 15, Section 3005(b), which

19   dictates that inmates must promptly obey written and verbal orders from prison staff – on June 7,

20   1998.[7]  ECF No. 467-12 at 26.  The parties do not dispute that the hearing was held on June 26,

21   1998 and, as such, it would appear indisputable that plaintiff was provided with timely notice of

22   the charges against him.  Plaintiff does, however, contend due process demanded that he be given

23   a copy of his investigative employee's report twenty-four hours before the hearing.  ECF No. 458

24   at 19-20.  He claims he never received the report prior to the hearing.  *Id*.   The Ninth Circuit has

25   held, however, that "the assignment of an investigative employee under Cal. Code Regs. tit. 15,

26

27           [7] The document is dated June 5, 1998 (ECF No. 467-12 at 26), but plaintiff states that it
     was served upon him on June 7, 1998.  ECF No. 472 at 34.

28

1   § 3315(d)(1) does not equate to a determination that [the claimant] had a federal due process right

2   to such assistance pursuant to *Wolff*." *Trujillo v. Vaughn*, 269 F. App'x. 673, 674 (9th Cir. 2008);

3   *see also Walker v. Sumner*, 14 F.3d 1415, 1419-20 (9th Cir. 1994) (federal due process is not

4   implicated when prison officials fail to comply with state procedural protections that are more

5   generous than those mandated by *Wolff*), *overruled on other grounds* by *Sandin v. Conner*, 515

6   U.S. 472, 483-84 (1995).  *Wolff* does contemplate legal assistance where a prisoner is illiterate or

7   the issues presented are legally complex.  418 U.S. 539 at 570.  Neither of those circumstances is

8   implicated here, however.  Plaintiff does not contend that he was illiterate and the issue raised by

9   the disciplinary – whether plaintiff disobeyed a staff member's verbal order – was not complex.

10  Defendants have also presented evidence that neither a staff assistant nor an investigative

11  employee was assigned to plaintiff because he did not meet the requirements of Cal. Code Regs.

12  tit. 15, § 3315(d)(1).  ECF No. 467-12 at 28.  The document informing plaintiff of that decision

13  was signed on June 7, 1998 -  before the hearing and before the charge was reduced to an

14  administrative violation.  *Id.*

15          Plaintiff references the Eighth Circuit's decision in *Coffman v. Trickey* which prohibits

16  prison officials from punishing inmates for violating unpublished rules.  884 F.2d 1057 (8th Cir.

17  1989).  This argument, to the extent[8] plaintiff is raising it here, is unavailing.   In *Coffman*, an

18  inmate was punished for waving at a woman with whom he had been corresponding.  *Id.* at 1058.

19  The two did not verbally communicate and she stood some distance from the prison fence.  *Id.*

20  Prison officials charged Coffman with violating a rule which prohibited "knowingly failing to

21  abide by any published institutional rule."  *Id.*  The Eighth Circuit found that Coffman's due

22  process had been violated because he had not been provided fair notice that this behavior was

23  prohibited.  *Id.* at 1060.  Critically, prison officials in that case could not point to a more specific

24  published rule which Coffman had violated.  *Id.*  Here, however, California Code of Regulations,

25  Title 15, Section 3005(b) plainly states:

26  ───────────────

27          [8] Plaintiff's motion for summary judgment notes that he referenced the case at his
    disciplinary hearing, but does not expound upon it for the purpose of proving any due process
    violation in this action.  ECF No. 458 at 20-21.

28

> Inmates and parolees must promptly and courteously obey written and verbal orders and instructions from department staff, and from other agencies with authorized responsibility for the custody and supervision of inmates and parolees.

Cal. Code Reg. tit. 15, § 3005(b).  This rule is broad, but it was clearly published and, unlike in *Coffman*, prison officials gave plaintiff clear notice that he was being charged with its precise violation.

Finally, plaintiff argues that defendant C.J. Peterson, on direction from D. Peterson, reduced his violation to an administrative offense in order to deny him a staff assistant and to prevent him from introducing the presented evidence into the permanent record.  ECF No. 458 at 20.  As noted above, however, records indicated that plaintiff had already been denied an assistant on June 7, 1998.  ECF No. 467-12 at 28.  Moreover, defendants state that the charge was reduced *after* plaintiff's evidence had been presented at the hearing.  ECF No. 467-12 at 26-27.  Finally, plaintiff does not dispute that he was allowed to call the single witness whose testimony he wanted to present.  ECF No. 473 at 9.  He has also failed to cite any authority - and the court has been unable to uncover any on its own - which holds that a prison official's failure to admit certain evidence into the permanent record violates an inmate's due process.  As such, it appears that plaintiff was provided with the due process which *Wolff* requires.

Given that this is the only remaining claim against defendant C.J. Peterson (now deceased), the motion for substitution of deceased defendant (ECF No. 465) should be denied as moot.

**D.** **First and Fourteenth Amendment claims against defendants Babich, Baughman, and Diggs**

As a preliminary matter, plaintiff's motion for summary judgment states that defendant D. Peterson chaired a classification hearing on May 5, 1998 and alleges that she made retaliatory statements regarding plaintiff's litigation against prison staff on that date.  ECF No. 458 at 23-24. The court has already limited the claims in this action to the six identified in the August 1, 2013 findings and recommendations.  ECF Nos. 363 & 367.  No claims related to plaintiff's May 5,

16

1   1998 classification hearing were among those selected to proceed and the court should decline to

2   consider this claim on that basis.  ECF No. 363 at 31.

3                          **1.  Due process claims**

4          Next, plaintiff's due process claims arising from his January 5, 1999 classification hearing

5   before Babich, Baughman, and Diggs should be dismissed.  Generally speaking, changes in

6   conditions relating to classification and reclassification do not implicate the Due Process Clause

7   itself.  *See Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir. 1987) (citing *Moody v. Daggett*,

8   429 U.S. 78, 88 n.9 (1976)) (no constitutional right to a particular classification).  Plaintiff argues

9   that the decision not to reclassify 'unlawfully' left him "on HDSP's Level IV Facility C, instead

10  placing him at the lowest custody level consistent his case factors, public safety, and placement

11  according to his classification score based on objective information and criteria."  ECF No. 458 at

12  34.   These arguments are unpersuasive because the Ninth Circuit, in declining to find a liberty

13  interest in an inmate's classification score, has previously held that the classification of an inmate

14  at a 'level IV' rather than a 'level III' prison does not present an "atypical and significant

15  hardship."  *Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007).

16                      **2.  First Amendment retaliation claims**

17         Plaintiff's retaliation claims against these defendants should be dismissed in part.  He

18  alleges that, at his January 5, 1999 classification hearing, defendants Diggs and Babbit

19  commented 'in a negative tone' that plaintiff was suing an employee.  ECF No. 458-1 at 18,

20  ¶ 119.  As a result of this comment, plaintiff construes the defendants' decision not to recalculate

21  his inmate classification score as retaliatory.  *Id.* ¶¶ 117-119.  He makes no allegation that

22  defendant Baughman made any comments indicative of retaliation on this date, however, and this

23  defendant should be dismissed on that basis.  *Yordy*, 753 F.3d at 904-905 (holding that "mere

24  speculation that defendants acted out of retaliation is not sufficient"); *see also Taylor v. List*, 880

25  F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of

26  personal participation by the defendant.").

27  /////

28  /////

1    The court finds that the claim against Diggs and Babbit implicates a clear factual dispute

2    that this court cannot resolve on summary judgment.  As previously noted, plaintiff claims that

3    these defendants referenced his ongoing litigation in a negative tone and declined his request to

4    recalculate his classification score.  ECF No. 458-1 at 18, ¶¶ 117-119.  For their part, Diggs and

5    Babbit deny retaliating against plaintiff and claim that they have no recollection of plaintiff even

6    requesting a recalculation at the January hearing.  ECF No. 467-3 ¶¶ 4-5, 10; ECF No. 467-6

7    ¶¶ 4-5, 10.  They note that that it was standard procedure for any recalculation requests to be

8    represented in the hearing 'chrono' and that no such request is represented there.  ECF No. 462 at

9    17.  Plaintiff's version of events is bolstered, however, by the fact that he filed an immediate

10   appeal complaining of the defendants' decision not to recalculate his score at the hearing.  ECF

11   No. 462 at 20.

12   To be sure, defendants are correct in noting that plaintiff's claims concerning their

13   allegedly 'negative tone' are threadbare.  He fails, for instance, to allege precisely what Diggs or

14   Babbit said, what ongoing litigation they referenced, or even how their tones were 'negative'.

15   Nevertheless, the court is not prepared to conclude that no reasonable finder of fact, assuming

16   they credited plaintiff's version of events over that of the defendants, could find for plaintiff on

17   this claim.  *See Anderson*, 477 U.S. at 250-252 (holding that the relevant inquiry is "whether the

18   evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

19   sided that one party must prevail as a matter of law.").

20   Defendants also raise a separate procedural argument which must be addressed.  They

21   argue that Cal. Code Regs. tit. 15, § 3375 (as it was instituted in January 1999) compelled them to

22   defer plaintiff's reclassification.  The relevant sections state:

23
         Inmates shall be given written notice at least 72 hours in advance of a hearing which
24       could result in an adverse effect;[9]

25   and

26   ───────────────────
         [9] "Adverse effect" is defined to include, *inter alia*, an "[i]ncrease in the inmate's custody
27   designation."  15 CCR § 3375(f)(1)(B).

28
                                                    18

> When a classification committee will consider a newly calculated or recalculated classification score, the inmate shall be provided with a copy of the completed CDC Form 839 (7/88), CDC Classification Score Sheet, or CDC Form 840 (6/87), CDC Reclassification Score Sheet, at least 72 hours before the hearing. The inmate shall be permitted to contest the classification score in the hearing.

Cal. Code Reg. tit. 15, § 3375(f)(1) and § 3375(f)(5), both reproduced at ECF No. 467-13 at 90. Defendants argue that plaintiff was not timely provided with either of these procedural safeguards and, as such, they could not have recalculated his score on the date in question even if they had been inclined to do so.  This argument has a superficial appeal, but the court declines to dismiss plaintiff's retaliation claims on this basis alone.  Notably, § 3375(f)(4) provides:

> If the inmate was not previously notified and during the classification committee hearing an unanticipated adverse effect emerges, the hearing shall be postponed for a (sic) least 72 hours and the inmate shall be referred to the inmate's counselor for assistance when the inmate is illiterate, or the issue are complex **unless**:
>
> (A) The hearing cannot be postponed because of safety or security factors.
>
> (B) The inmate waives the 72-hour postponement.

Cal. Code Reg. tit. 15, § 3375(f)(4)(A)-(B) (emphasis added), reproduced at ECF No. 467-13 at 90.  It is unclear whether plaintiff waived or attempted to waive this right at the January 1999 hearing.[10]  Second, the regulations are silent as to whether the failure to provide an inmate with a CDC form (as referenced in § 3375(f)(5)) would require the committee to defer a recalculation even where the inmate was properly apprised of this safeguard and voluntarily elected to waive it.

In light of the foregoing, the court recommends only dismissing the retaliation claim against defendant Baughman.

### E.        First and Fourteenth Amendment claims against defendant Reyes

Plaintiff alleges that, on January 28, 1999, Reyes retaliated against him by raising his inmate classification score by twelve points.  ECF No. 319 ¶¶ 64, 73.  He claims Reyes' retaliation was motivated by his submission of a grievance protesting the classification

---

[10] Plaintiff is silent on this issue and defendants' version of events (wherein they deny any recollection of being asked to recalculate plaintiff's score) precludes any attempt to meaningfully address this question.

1    committee's decision not to recalculate his inmate classification score on January 5, 1999.  *Id.*

2    ¶ 66.  He also claims her actions violated his due process rights insofar as they contravened Cal.

3    Code Regs. tit. 15, § 3375.  *Id.*

4        First, there is no due process violation here for the same reason articulated in the

5    foregoing claim against Babich Baughman, and Diggs; namely, that a prisoner has no right to a

6    particular classification.  *See Hernandez*, 833 F.2d 1316 at 1318.  Moreover, an appeal process

7    was provided and plaintiff availed himself of it.  The record indicates (and the parties do not

8    dispute) that Reyes' twelve-point adverse modification to plaintiff's classification score was

9    ultimately reversed on appeal and, as such, it is unclear that plaintiff sustained an injury that

10   would give rise to an actionable due process claim.  ECF No. 467-12 at 54;  *see, e.g., Horne v.*

11   *Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998) (due process claims regarding initial disciplinary

12   hearing were rendered moot after conviction was vacated and a new hearing ordered, and plaintiff

13   suffered no loss of good time credits and no disciplinary record); *Morissette v. Peters*, 45 F.3d

14   1119, 1122 (7th Cir. 1995) ("There is no denial of due process if the error the inmate complains

15   of is corrected in the administrative appeal process.").  Plaintiff does claim that the injury was

16   'irreversible' insofar as his annual review had already passed by the time Reyes' adjustment was

17   overturned.  ECF No. 319 ¶ 64.  This is a curious argument given that the adjustment did not

18   result in any adverse classification action based on the new score- that is, he did not move from

19   one level to another or see any change in the conditions of his incarceration based on the new

20   score.  *See* ECF No. 467-12 at 55.  It may be that plaintiff is arguing that he would have been

21   classified as a "level III" inmate were it not for Reyes' actions, but there is simply insufficient

22   evidence in the record to support that supposition.  In any event, as noted above, plaintiff was not

23   constitutionally entitled to a lower classification.

24       Plaintiff's retaliation claims against Reyes also fail.  Unlike his allegations against Babich

25   and Diggs which, although sparse, were at least sufficient to allow a fact-finder to infer

26   retaliation, his claims against Reyes amount to little more than legal conclusions.  Notably, he has

27   failed to plead any facts which support his claim that Reyes' actions were undertaken

28   intentionally and in retaliation for a previously filed grievance.  It is settled law that retaliation

1    cannot be established simply by pointing to some adverse activity by a defendant which occurred

2    after protected speech; there must be some demonstrable nexus between the two.  *See Huskey v.*

3    *City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (a retaliation claim cannot rest on the logical

4    fallacy of post hoc, ergo propter hoc - "after this, therefore because of this").

5         **F.       First Amendment claim against defendant Haas**

6         Plaintiff states that, on February 25, 1999, defendant Haas made numerous statements

7    regarding plaintiff's notoriety as a jailhouse lawyer.  ECF No. 319 ¶ 47.  He allegedly told

8    plaintiff "if you're gonna sue me – sue me . . . I got friends throughout the state."  *Id.*  Plaintiff

9    alleges that he perceived Haas' statement as a threat and told Haas that he intended to file a "602"

10   on it.  *Id.*  The next day, Haas allegedly approached his cell and loudly announced that plaintiff

11   was a "shot caller"[11] three times.  *Id.*  Plaintiff argues that Haas' statements were intended to

12   single out him out for serious injury or death at the hands of other inmates and that they were

13   motivated by plaintiff's litigation and stated intention to file grievances.  *Id.*  Haas denies calling

14   plaintiff a "shot caller," knowing of his litigative activities, or even having any knowledge of

15   what the term "shot caller" meant in 1999.  ECF No. 467-7 ¶¶ 2-5.

16        Defendants admit that the facts surrounding this claim are disputed, but argue that it

17   should still be dismissed in light of plaintiff's deposition testimony indicating that Haas called

18   plaintiff a "shot caller" because he asked to speak to a sergeant about his missing property.  ECF

19   No. 467 at 13.  They note that speaking with a sergeant is not a protected activity and argue that

20   plaintiff's claim must fail on that basis.  *Id.*  Plaintiff's deposition states, in relevant part, that "I

21   knew why he was doing it because I was requesting to speak to his Sergeant."  ECF No. 467-13 at

22   144 (pg. 179 of the deposition).  Later in that deposition, however, plaintiff articulates his belief

23   that Haas called him a "shot caller" because of his status as a litigator.  In relevant part:

24

25        Q. So he yelled Shot Callers, and made it very specific that he meant plural for
          your litigation activities, why would he also refer to Mr. Garcia as being litigious
26        if he wasn't?

27        _____
          [11] Plaintiff argues that "shot caller" is commonly understood to refer to "a person who
28   makes significant decision (sic) in a prison gang."  ECF No. 472 at 31.

                                              21

1
2
3

A. Well, because I'm the one that got at him the day before when he stated, if you're going to sue me, sue me. I was the litigator in there. Now, the thing is that he just pointed at my cell. We knew how it was. I mean I had people that didn't want to be my cellee because of retaliation and other harassment that I get because of my legal activities.

4
5
6

Although he said Shot Callers meaning plural, it stemmed from the day before when he told me, if you're going to sue me, sue me.  Just Haas doing, treating people like he normally treats people, and as I mentioned earlier, particularly me because they know I'm a litigator.

7
8

Q. Did he ever tell you that the reason he called you a Shot Caller on February 25th, 1999 was because of your litigation activity?

9

A. No. But it was clear to me and my cellee.

10

*Id.* (pps. 180-181 of the deposition).

11

Given the clear factual disputes underlying this claim, the court finds that its resolution on

12

summary judgment would be inappropriate.

13

**V.    Conclusion**

14

Accordingly, it is RECOMMENDED that:

15

1.      Plaintiff's motion for summary judgment (ECF No. 458) be denied;

16

2.      Defendants' motion for summary judgment (ECF No. 466) be granted in part. The

17

following claims should be dismissed:

18

(a) Eighth Amendment claims against defendants Castro and D. Peterson;

19
20

(b) Fourteenth Amendment claims against defendants Holmes, C.J. Peterson, and
    D. Peterson;

21
22

(c) Fourteenth Amendment claims against defendants Babich, Baughman, and
    Diggs;

23

(d) First Amendment claims against defendant Baughman; and

24

(e) First and Fourteenth Amendment claims against defendant Reyes.

25

Defendants' motion should be denied in all other respects.

26

/////

27

/////

28

/////

22

3.    If the District Judge adopts the recommendation that the Fourteenth Amendment claim against defendant C.J. Peterson be dismissed, the court also recommends denying plaintiff's motion for substitution of deceased defendant (ECF No. 465) as moot.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 8, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE